THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* TOMÁS PEREIRA, Defendant and Appellant.

No. 6008. Argued March 17, 1936.—Decided May 7, 1936.

*R. Rivera Zayas* for appellant. *R. A. Gómez, Prosecuting Attorney,* and *Luis Janer, Assistant Prosecuting Attorney,* for appellee.

MR. JUSTICE CÓRDOVA DÁVILA delivered the opinion of the court.

On or about June 13, 1934, at night, Justo Machuca and his son Julián were going on foot from Santurce to Río Piedras. Justo was walking behind Julián, along Ponce de León Avenue, both at a very short distance from each other and very close to the curb. On reaching Stop 27½, Hato Rey, an automobile which traveled from San Juan to Río Piedras ran over Justo Machuca inflicting upon him certain injuries that caused his death.

Tomás Pereira was charged with involuntary manslaughter. In the information it is alleged that the said Pereira was operating the automobile carelessly and negligently, without exercising due care and circumspection. The jury rendered a verdict of conviction, and the defendant was sentenced to four months in jail. It is urged that there was manifest error in weighing the evidence and that no evidence whatsoever was introduced to prove that the defendant was the driver of the vehicle that caused the accident, nor that he was in any manner connected with the occurrence.

■ Two witnesses testified upon this point: Juan J. Parsi and Francisco Beltrán. The defense maintains that their testimony is insufficient to connect Tomás Pereira with the accident.

The witness Juan J. Parsi testified as follows:

"On June 3 of last year between 7 and 7:15 p.m. I left my home at Stop 27, Hato Rey, between Santurce and Hato Rey; in front of the White Star Line, or thereabouts, I came across an automobile going towards Río Piedras and, as it had its headlights on and the glare made my driving difficult, I flashed on my headlights too, and just as I passed said automobile, I heard a crash; I stopped my car on the right side and got off; a lot of people had rushed to the curb and there I saw two men. As I was able to conclude that the car I had met was the one that caused the accident, I asked: 'What became of the car?' And they told me: 'It kept on going.' I went after it and found it had stopped in front of my house; there were two men standing behind the car, and I told the tallest one: 'You ran over a man down there, why don't you go and pick him up?' but he told me, 'It wasn't I it was those ones and I am telling them to go and pick him up'; and he told me, 'Let them pick him up.' I went on to the Hato Rey station; there was a strike going on and on that account a policeman was there, and the policeman had to call to Río Piedras to ask for permission, and when he got his permission he went up to the front of my house and the car had already left; we continued to the scene of the accident and they had already taken the man to the hospital."

The witness further stated that at first he did not recognize the persons he saw behind the automobile; that afterwards he found out that they were a boy by the name of Torrens and the defendant, who was immediately behind Torrens; that Torrens stated it was not him who had caused the accident but pointing backwards said it had been them.

Detective Francisco Beltrán testified that his superiors ordered him to investigate the facts of the accident referred to in the complaint. He stated that he went to Caguas, to the defendant's house, and told him he had committed a felony and that then the defendant stated that really he was to blame for the accident which occurred on June 3, at 7 or

7:15 p. m., while he was driving, together with another friend, a Chrysler car, license No. 8276, from Isla Verde to Caguas; that the defendant told him that he kept on driving after the accident and that he stopped the car at some distance; that then they returned to the place of the accident but that they had already taken away the injured person; that then, afraid that there might be around that place a relative or some interested party that might assault him, he went on to Caguas. On cross-examination the witness testified that the defendant made all these statements before Parsi, at the defendant's house.

Parsi testified that he saw Pereira in Caguas, in front of his home, just as he was getting up, and added that the defendant testified at the police station but not in his presence. In the opinion of the defense, as Beltrán is the only witness that attempted to connect the defendant with the accident, and as his testimony was contradicted by that of Parsi, the judgment appealed from should be reversed for want of evidence tending to connect Pereira with the accident occurred. The defense adds that there is a circumstance that should put us on guard concerning the veracity of Beltrán's testimony, and it is that the form and the wording of the admission attributed to the defendant complies with the procedure or technique used by the police, including all the requisites required of an admission to prove through it a point in controversy. We are not discussing in this case the veracity of the witnesses because this is matter wholly within the province of the jury. Beltrán testified that Pereira confessed before Parsi that he was the person responsible for the accident. The latter testified that the defendant gave his testimony at the police station, but not in his presence. The jury who saw and heard both witnesses testify rendered a verdict of conviction, and we would not be justified in reversing the judgment appealed from, exclusively on a ground which relates solely to the weight given to the evidence.

██ The evidence proved that the defendant had no license to operate a motor vehicle. The defense, on the authority of *Maldonado* v. *Hamilton*, 32 P.R.R. 208, maintains that the mere fact that an automobile driver does not have the required statutory license is not in itself enough to prove carelessness and criminal negligence in the operation of an automobile that occasions an accident, unless such want of a license should have a causal connection with the accident. In the above-cited decision it is said that "the consensus of opinion in the jurisprudence seems to establish the principle that the driving of an automobile without a license, in violation of the statute, is *prima facie* evidence of negligence, but if damages result from an accident there must appear a relation of cause and effect between the violation of the statute in that respect and the damage inflicted."

The latest decisions hold, according to the weight of authority, that the fact that a motor vehicle has not been registered or that its driver has not the statutory license to operate it, does not imply a liability on the part of the owner or the driver where the failure to register the vehicle or to secure the license to operate it, has no causal connection with the injury or damage inflicted. See annotations appearing in volumes 73 and 87, A.L.R., pages 165 and 1473, respectively. This is the theory applicable to civil actions. We are of opinion that in a case of manslaughter, such as the present one, the district attorney, who must prove the facts alleged, must introduce the necessary evidence to show the corresponding causal connection between the violation of law and the accident that occasioned the death.

At the request of the defense, the district attorney set forth in a bill of particulars the specific acts of negligence that in his opinion had been committed by the defendant. It is alleged in this bill of particulars that the defendant was driving the automobile without a license, that he was under the influence of liquor, that he displayed no white lights in front of said vehicle, that he did not blow his horn, that he

was speeding, riding faster than 24 or 48 kilometers per hour.

There was no evidence to the effect that the defendant was under the influence of liquor. Concerning the absence of white lights in front of the automobile, witness Julián Machuca, son of the deceased, testified that the lights were off. Parsi testified that the car had the headlights on and as they bothered him in his driving, he flashed his headlights on also, and that then the driver of the other car turned off all of his lights and flashed the parking ones; that he did this a moment before passing him. This testimony shows that the car that caused the accident had the lights turned on and that it turned off some of them and left the parking ones burning a few moments before passing the car driven by Parsi. Julián Machuca, who was going towards Río Piedras, was walking in the same direction and with his back turned to the automobile that caused the accident.

It is also alleged that the car did not sound its horn. Concerning this point Julián Machuca testified in the negative when answering questions asked by the prosecuting attorney. Antonio Maldonado, a witness for the prosecution, testified that at the time of the accident there was quite some traffic, automobiles and busses, on the road. Ladislao Santos, a witness for the defendant, testified that he heard a horn but that he did not know who sounded it. Ramón de Jesús testified that many cars went by and that different horns were heard, but he can not say whether it was one of those cars. This is the only evidence on this point that appears in the record.

The allegation that the automobile was being driven at a rate of speed faster than 24 or 48 kilometers per hour is based on subdivision a, section 13, of Act No. 75 of 1916 (Session Laws, p. 140), which reads as follows:

"The speed of motor vehicles shall at all times be regulated with due care and with due regard to the width, amount of traffic and use of the highway, but the driving at any time of any motor vehicle on the public highway at any rate of speed faster than forty-eight

kilometers an hour, or within the urban zone of a municipality faster than twenty-four kilometers per hour, shall be *prima facie* evidence that it was being driven without due care.''

As we have seen, the accident took place on a public road, in a place where there was heavy traffic. Julián Machuca testified that the car was flying, as it was not on the road (*el carro iba por el aire, porque no iba por la carretera*). To be more precise, we shall transcribe his own words: ''That car was flying as it was not on the road, and one dropped dead, him, and I was seriously wounded . . . The car was almost flying, it was not on the road, it was flying, that car . . . My father fell seriously injured, with his skull battered, full of injuries around here, and with a broken arm and also a broken leg . . . We fell into the ditch, we were walking almost on its edge.'' The witness added that he told his father: ''My God, father, there comes a car and if we don't get off it's going to hit us.'' Antonio Maldonado testified that the car was going quite fast. The defense witness Ladislao Santos stated that the car that went by was travelling fifteen or twenty miles per hour when he heard the crash.

This was the evidence that the jury had under consideration concerning the speed of the car that caused the accident. The jury, who heard the witnesses testify and who could take into account all the circumstances of the case, considered this evidence as sufficient and rendered a verdict of guilty.

It might be argued that this testimony is vague and uncertain. This is the evidence, however, that may be introduced in many cases of criminal liability where the witnesses, who are not experts, cannot otherwise judge the rate of speed.

In the case of *Bowen* v. *State,* 140 S.W. 29, the Supreme Court of Arkansas said:

''Over the objection of appellant the court permitted a witness to testify, in response to a question as to whether the automobile was going fast or not, as follows: 'I remarked to this fellow Vaughan;

I said: ''Gee, look at that thing go.'' ' And further to testify that he judged the machine was going about 30 miles an hour. Another witness, over the objection of appellant, was permitted to testify, in answer to a question as to whether the automobile was going at an unusual rate of speed or not, as follows: 'Unusually fast.' And further, in answer to the question, 'What was his (defendant's) manner?' as follows: 'Personally speaking, I don't think I would use quite as careless a manner as he used here.' Other witnesses, over the objection of appellant, in answer to questions as to whether the automobile was going at an unusual rate of speed or not, testified as follows: 'I think so; yes.' And again: 'Yes, it was unusual.' The appellant contends that this testimony was incompetent, for the reason that the witnesses had not shown that they had any knowledge of what the usual rate of speed of an automobile is, or that their experience would enable them to judge of the rate of speed of an automobile.

''The killing occurred on the streets of Little Rock, where automobiles are constantly passing. Transportation by automobile may be taken as a matter of common knowledge and general information. It does not require the knowledge of an expert to determine whether an automobile is moving at a usual or unusual rate of speed. Any person of ordinary understanding and common observation is competent to speak upon that question. In the case of *Railway Company* v. *Thomason,* 59 Ark. 143, 26 S. W. 598, this court said: 'The witness was testifying to matters of fact which he says he had observed, and about which men of common understanding might be informed upon observation. Any person cognizant of the facts upon which he bases his judgment may give his opinion on questions of identity, size, weight, distance, and time. Such questions are open to all men of ordinary information.' Again: 'We can see nothing in the distance or range of the reflection of light by the headlight of an engine calling for the exercise of peculiar skill, the possession of professional knowledge, or requiring any peculiar habit of study in order to qualify a person to understand it, and to testify about it intelligently.' The same may be said as to the speed of an automobile. (Citations.)

''In *State* v. *Watson,* 216 Mo. 420, 115 S. W. 1011, there was a conviction for manslaughter; the charge being similar to that under consideration. Several witnesses, who saw the automobile running, testified that defendant was driving the automobile at a high rate of speed. The defendant in that case objected to the testimony, con-

tending that it was error to permit the witnesses 'who knew nothing about the operation of automobiles to give their opinions as to the rate of speed at which the automobile being operated by the defendant was running just before the deceased was struck.' The court in that case said: 'The rate of speed at which an automobile is running is not a matter exclusively for the testimony of experts. If that were true, then, as has been intimated by this court, it would be a matter of impossibility for those injured by the running of vehicles, either automobiles, street cars, or regular railroad cars, to always have experts at hand to show what rate of speed was being made. A holding of that character would be wholly impracticable and do a great injustice to many persons who had been negligently injured by vehicles of the character indicated running at an excessive rate of speed. At last, the only reasonable settlement of that question is to hold that witnesses who at least know what an automobile is and have seen them operated might give their opinions as to the rate of speed. As to the weight to which such opinions are entitled is a matter entirely for the jury.' (Citations.)''

As we have seen, a witness testified that the car was flying rather than riding on the road, and used this expression to convey the idea of an excessive rate of speed. Another witness stated that the car was going quite fast, and the last one, a witness for the defense, stated that the speed was fifteen or twenty miles an hour.

The weight to be accorded to this evidence is matter exclusively for the jury, whose opinion we must respect. If the jury believed the testimony of the witness Julián Machuca and, bearing in mind the circumstances of the case, believed the defendant to be guilty of criminal negligence, we do not feel warranted in intervening to set aside their verdict.

The judgment appealed from must be affirmed.

Mr. Justice Travieso took no part in the decision of this case.